CHRISTINE A. FLYNN *vs.* CURTIS AND POPE LUMBER
COMPANY & others.

Norfolk.    March 15, 1923. — May 25, 1923.

Present: RUGG, C.J., BRALEY, DeCOURCY, CROSBY, & PIERCE, JJ.

*Mortgage,* Of real estate: foreclosure, equitable mortgage. *Equity Jurisdiction,* To establish rights as equitable mortgagor.

Upon findings of a master, without a report of evidence, in a suit against two defendants to have declared invalid a sale to a nominee of the first defendant in foreclosure of a second mortgage to that defendant from the plaintiff, a married woman, and a conveyance by that grantee to the second defendant, it was *held*, that

(1) It was plain that the mortgagor, personally and through her husband as agent, acquiesced in the entire foreclosure proceedings, knew of the time and place of sale, did not desire that the sale should be adjourned, and expected and desired the mortgagee to acquire title;

(2) The plaintiff therefore could not attack the foreclosure proceedings or the sale on the ground that the notice of the sale named a day of the month but no year, that an unlicensed customer acted for the mortgagee, that no one was present to bid, or that the mortgagee, though absent, caused the property to be bid in for himself through the auctioneer, although the mortgage gave no such power;

(3) The fact, that the mortgagee through his agent was the only bidder and was not personally present, was not as a matter of law sufficient to cause the sale to be set aside;

(4) The fact, that the auctioneer at the sale had not an auctioneer's license, did not invalidate the sale;

(5) In the absence of bad faith, there was no legal objection to the auctioneer making a bid for the mortgagee or purchaser;

(6) It was plain that the plaintiff consented to the foreclosure sale as it was conducted in the belief that the defendants would take title and would hold such title without a formal mortgage as security for the protection of themselves and of the plaintiff and that the defendants knew that the plaintiff consented that the title should be taken in the name of the defendants because she believed the defendants would hold the title not adversely but subject to a right of redemption in the plaintiff;

(7) Although neither the defendant mortgagee nor his nominee in whose name the title was taken in the foreclosure proceedings made an express agreement to hold the title subject to the understanding and belief of the plaintiff, above described, which was known to the defendant, the acts of of the parties should be construed as evidencing an intention to put the legal title in the name of the defendant, and that the result should be held equivalent to a present loan of money from the defendant to the plaintiff upon the security of an absolute deed;

(8) The facts found plainly showed that the grantee from the record purchaser at the mortgagee's sale was an innocent purchaser for value, and a decree dismissing the bill as to him was warranted;

(9) A decree directing the defendant mortgagee to account to the plaintiff for the difference between the fair value of the equity of redemption conveyed to the purchaser from the mortgagee's nominee and the amount secured by the equitable mortgage, after making all proper charges and credits, was proper.

BILL IN EQUITY, filed in the Superior Court on December 8, 1919, and afterwards amended, against Curtis and Pope Lumber Company, a corporation, Myer R. Rittenberg and Morris Finkelstein, to have declared invalid a sale to one Lucey in foreclosure of a second mortgage of the plaintiff to Curtis and Pope Company of premises on St. Paul Street in Brookline and a deed of Lucey to the defendants Rittenberg and Finkelstein; that the property be reconveyed to Curtis and Pope Lumber Company, who should be declared to hold it as mortgagee for the benefit of the plaintiff, and that the plaintiff be allowed to redeem the land from such second mortgage.

The suit was referred to a master. Material facts found by the master are described in the opinion. Exceptions to the master's report were heard by *Hammond*, J., by whose order there was entered the interlocutory decree described in the opinion. The suit then was reported to this court on terms described in the opinion.

*J. B. Jacobs*, (*C. A. McCarron* with him,) for the plaintiff.

*H. P. Williams*, (*C. G. Brownville* with him,) for the defendant Curtis and Pope Lumber Company.

PIERCE, J. This is a bill in equity filed in the Superior Court, December 8, 1919. The bill seeks to have declared invalid a foreclosure sale of a certain parcel of land situated in Brookline, Massachusetts; to have the defendants Myer R. Rittenberg and Morris Finkelstein, purchasers of said property, held to be purchasers with notice of the alleged invalidity of the sale and be ordered to redeliver said property subject to the first mortgagee to the plaintiff, upon payment of the amounts of money found to be due from the defendants or any of them. The bill further prays that the defendant company may be declared to hold said property

as mortgagee or trustee for the benefit of the plaintiff, merely as security for the plaintiff's debt and that the plaintiff be allowed to redeem.

The case was sent to a master. Upon the coming in of the master's report, after hearing the parties, a judge of the Superior Court filed the "Memorandum and Order for Decree" which follows: "Upon the facts found by the master and the reasonable inferences to be drawn from them, I find that it was understood between the plaintiff and her husband, on the one hand, and the officers of the defendant corporation, on the other, at the time of the foreclosure sale in March, 1918, that the defendant corporation, acting through Lucey, its credit manager, was to take title to the property in question by virtue of a sale under proceedings to foreclose the second mortgage, and was to hold such title as security for any indebtedness due to it from the plaintiff and her husband, including moneys expended in the completion of the garage and dwelling house. I therefore rule that after the foreclosure sale Lucey held the property as equitable mortgagee of the plaintiff. I find and rule that the defendant Rittenberg was a purchaser for value without notice of any equitable rights. . . . " The judge then ruled that the plaintiff was entitled to an accounting, ordered the exceptions to be overruled, the master's report confirmed and the case recommitted to the master to take an account.

This order was followed by an interlocutory decree which ordered adjudged and decreed:

" 1. That the plaintiff's exceptions to the master's report be, and hereby are overruled.

" 2. That the master's report be, and hereby is confirmed.

" 3. That the defendant Myer Rittenberg is a *bona fide* purchaser for value, without notice.

" 4. That the bill of complaint be dismissed as against the defendant Myer Rittenberg and the defendant Morris Finkelstein.

" 5. That the defendant Curtis and Pope Lumber Company on October 15, 1919, held the property in question as equitable mortgagee of the plaintiff, to secure any indebted-

ness due to it from the plaintiff and Martin Flynn, her husband, including moneys expended in the completion of the garage and dwelling house.

"6. That the plaintiff is entitled to an accounting from the Curtis and Pope Lumber Company for the difference between the fair value of the equity of redemption conveyed to the defendant Rittenberg on October 16, 1919, and the amount secured by said equitable mortgage, after making all proper charges and credits.

"7. That the case be recommitted to the master to take the account from the Curtis and Pope Lumber Company of the equity of redemption conveyed to the defendant Rittenberg on October 16, 1919, and the amount secured by said equitable mortgage after making all proper charges and credits."

The plaintiff and the Curtis and Pope Lumber Company appealed — and the judge, "Being of the opinion that the interlocutory decree, entered June 16, 1922, in above entitled cause, from which decree the plaintiff and defendants duly claimed appeal, so affects the merits of the controversy that the matter ought before further proceedings to be determined by the full court, . . . [reported] the case to the Supreme Judicial Court for that purpose upon the substituted bill of complaint, the defendant's answers, the master's report, the exceptions thereto, the memorandum and order for decree, the interlocutory decree, the plaintiff's appeal and the defendant's appeal and the defendant's petition for report."

We shall consider the questions raised as far as possible in the order in which they are presented in the briefs of the plaintiff and defendants. The plaintiff contends that the foreclosure notice and sale thereunder on March 19 was invalid for the following reasons: (1) Because the notice gave the date of sale as March 19 without any year; (2) Because the mortgagee knowingly employed an unlicensed auctioneer; (3) Because there was no one present to bid; (4) Because the mortgagee cannot directly or indirectly purchase the property himself, unless the mortgage so provides; (5) Because a mortgagee with a power to sell must

be personally present at the sale, and cannot appoint an
agent to make the sale unless authority to make such appointment is granted in the instrument; and (6) Because an auctioneer, where there are no bids, cannot bid in the property
for the mortgagee, the mortgagee not being present.

The master's findings upon unreported evidence in relation
to the notice of foreclosure and the conduct of the sale succinctly stated are as follows: The sale was advertised to
take place on Tuesday, March 19, (the year being omitted)
at eleven o'clock A.M.    The public notice advertised the
property for sale subject to a $30,000 first mortgage held
by the Beacon Investment Association.    The sale occurred
at twelve o'clock.    There were several persons present at
the sale who came pursuant to the notice.    These persons
were not obliged to wait an undue length of time and the
sale was not delayed an hour after the advertised time.
" At the hour fixed for the sale, there were present at the
garage the following persons: Mr. Moffette, who later acted
as auctioneer, Mr. Flynn, the husband of the plaintiff,
Fred H. Williams, Esquire, attorney for Mr. Moor, the
tenant of the garage under a lease given to the latter by
the plaintiff . . . Mr. Moor, the tenant, Clarence L. Moor,
a brother of the latter, Mr. Charles L. Aldrich, who held the
third mortgage on the garage."    The master further finds
" that during the sale workmen and customers connected
with the garage were passing in and out near where the
sale was conducted, but there was no evidence that they gave
any attention to the sale, . . . that Edward Moffette, who
acted as auctioneer at the sale, was at that time and for many
years prior thereto had been an employee of the Curtis and
Pope Lumber Company; that his special duties related to
the care of real estate owned by the company or upon which
the company held mortgages.    Mr. Moffette had previously
been an auctioneer; . . . that Mr. Moffette had full charge
of the sale in behalf of the defendant corporation; " that
" the foreclosure notice had been drawn by an attorney,
but the actual conduct of the foreclosure sale was left by the
company in charge of Mr. Moffette; " that " Mr. Moffette
had arranged with a duly licensed auctioneer to be present

and make the sale but owing to a misunderstanding as to the identity of the premises the licensed auctioneer went to another garage on the same street and waited at the other garage for Mr. Moffette to arrive;" that "Mr. Moffette arrived at the mortgaged premises a few minutes prior to the time fixed for the sale and put out a red flag;" that "At the time fixed for the sale, the licensed auctioneer not having arrived, Mr. Moffette read the foreclosure notice in the presence of the persons above indicated and called for bids, and Mr. Williams, in behalf of the tenant occupying the garage then announced that his client held a lease for ten years from October 1, 1916, given to him by the Flynns, which lease was dated June 19, 1916, and was claimed by the tenant to be prior to any existing mortgage upon the premises;" that "Mr. Williams gave formal notice of the claim of the tenant as to the priority of his leasehold title;" that "After this announcement or notice by Mr. Williams, Mr. Moffette again asked for bids. No bids were made whereupon Mr. Moffette himself said, '$500' and asked for further bids;" that "No bids were made in reply to the second request, whereupon Mr. Moffette said, 'Sold'"; that "Mr. Williams thereupon said, 'Sold to whom,' to which Mr. Moffette replied, 'To Daniel A. Lucey'"; that "The persons present then separated."

The master finds that Mrs. Flynn was not present at the sale but was at her home nearby and had full knowledge of the fact that the sale was to occur on the day and at the hour when it did actually occur; that Mr. Flynn was present at the sale and made no protest or complaint as to the manner in which the sale was conducted. The master further finds that "the equity . . . was worth a sum substantially in excess of $500;" that it was the expectation of both Lucey and Flynn that the mortgagee would get title under the foreclosure proceedings and this was one of the purposes of the foreclosure. In response to a request for a finding "That the mortgagee did not exercise good faith in executing the power of sale," the master found that "so far as this request calls for a conclusion of fact I decline to make it in the form set forth. Neither the mortgagee nor the

mortgagor expected or desired any interest in the foreclosure on the part of the general public.   The sale was conducted by Moffette in behalf of the Curtis and Pope Lumber Company with the expectation that the mortgagee would obtain title under the foreclosure.   The husband and agent of the mortgagor and Mr. Aldrich, the third mortgagee, were both present at the sale and made no protest or request for adjournment or further publicity."

It is plain that the mortgagor, personally and through her husband as agent, acquiesced in the entire foreclosure proceedings: she knew of the time and place of sale, she did not desire that the sale should be adjourned, she expected and desired the mortgagee to acquire title.   In these circumstances she cannot, after the sale, attack the validity of it on any one of the eight grounds assigned.   *Feuer* v. *Capilowich,* 242 Mass. 560.   *Markey* v. *Langley,* 92 U. S. 142.   *Learned* v. *Geer,* 139 Mass. 31.   *Taylor* v. *Weingartner,* 223 Mass. 243, 248.   *Manning* v. *Liberty Trust Co.* 234 Mass. 544, 547.   G. L. c. 183, §§ 21, 25.   The fact that the defendant company through its agent was the only bidder and was not personally present is not sufficient to set aside the sale.   *Manning* v. *Liberty Trust Co. supra.*   The fact that the auctioneer at the sale had not an auctioneer's license does not invalidate the sale.   *Williston* v. *Morse,* 10 Met. 17, 23.   *Larned* v. *Andrews,* 106 Mass. 435.   *Learned* v. *Geer, supra.*   In the absence of bad faith there is no legal objection to the auctioneer making a bid for the mortgagee or purchaser.   *Richards* v. *Holmes,* 18 How. 143.   *Hosmer* v. *Sargent,* 8 Allen, 97, 99.   *Dexter* v. *Shepard,* 117 Mass. 480, 485.   *Springfield Engine & Thresher Co.* v. *Donovan,* 147 Mo. 622.

In relation to the claim of the plaintiff that the defendant Lucey held the property upon foreclosure as equitable mortgagee of the plaintiff, the master, without a report of the evidence, in substance, finds: that the plaintiff in April, 1916, became the owner of the premises in question; that her husband had for many years been engaged as a builder and during these years had had extensive dealings with the defendant Curtis and Pope Lumber Company, and therefore

was well known to the officers of that corporation; that there were relations of mutual friendliness and confidence existing between Martin Flynn and the Messrs. Cottle and Pope, respectively the president and treasurer of the defendant corporation; that in all the transactions hereinafter set forth, Martin Flynn acted as agent for the plaintiff and had full charge of the building operations and the negotiations and transactions connected therewith.

The master found that during the summer of 1916 the plaintiff and her husband began building operations upon the premises so acquired by the plaintiff, at once making certain changes in the dwelling house in order to change the single dwelling house into a two family house, and later removing the sheds and outbuildings and preparing the grounds for the erection of a large public garage in the rear of the dwelling house. The work was begun on the foundation for the garage in June, 1916, and the plaintiff and her husband were seeking to find a construction mortgage to make possible the completion of the garage. This fact was communicated by Martin Flynn to Daniel A. Lucey, the secretary and credit manager of the defendant corporation, who telephoned to James Henderson, of Henderson and Ross, real estate brokers, that Flynn wanted a construction mortgage; and as a result of negotiations between Henderson and Flynn a construction mortgage was placed by Henderson with the Beacon Investment Association, an organization with which Henderson was connected either as officer, agent or otherwise. This construction mortgage was for $30,000 and was dated September 27, 1916. At the time of the giving of this mortgage to the Beacon Investment Association, the foundation of the garage had been laid and the walls carried up to receive the first floor; concrete supporting columns had been set up and the structure was in readiness to lay the first floor. The Beacon Investment Association advanced $12,000 on September 27, 1916, which was used to pay off three prior mortgages upon the property; so that the mortgage of the Beacon Investment Association thereupon constituted a first mortgage on the property. The Beacon Investment Association from time to time advanced

money under the said construction mortgage in accordance with a written agreement as to payments, until the full sum of $30,000 had been advanced.   At the time of giving this mortgage the Curtis and Pope Lumber Company held the note or notes of Martin Flynn aggregating approximately $4,600, all of which were indorsed by the plaintiff, Christine A. Flynn.   In the early part of November, 1916, Martin Flynn ordered additional material to the amount of approximately $1,000 which material was delivered on different days up to November 28, 1916.

About the middle of November, 1916, Pope, the treasurer of the defendant corporation, and Lucey, the secretary and credit manager, called on Flynn at his garage in Brookline and requested a second mortgage to protect them for what was then owed to the lumber company and for such material as he had ordered or might thereafter order in connection with the construction of the garage.   It was suggested at this conversation that the mortgage should be for $10,000.   Flynn demurred to the amount of the mortgage, saying that this amount was greater than the indebtedness which might exist.   After consulting with the plaintiff and further conversation with the representative of the Curtis and Pope Lumber Company, a second mortgage for $4,000 was drawn which mortgage was executed by Mr. and Mrs. Flynn.   This mortgage was dated November 25, 1916, and calls for the payment of $4,000 in one month at six per cent.   The mortgage ran to Minnie T. Connor, as mortgagee, who at that time was the bookkeeper of the defendant corporation.   No money was paid by either Miss Connor or the defendant corporation at the time of the giving of the mortgage nor was the amount of the mortgage passed to the credit of the account against Flynn on the books of the corporation.   The master further finds " that the mortgage was given by the mortgagors and taken by Miss Connor in behalf of the defendant corporation in order to protect the latter, so far as it afforded protection, for the amount then due from Martin Flynn to the defendant corporation, and for such additional indebtedness as might accrue by reason of lumber and other materials supplied

during the further progress of the garage construction. At the time of the giving of this mortgage, the only liability of Mrs. Flynn to the defendant corporation was as indorser upon the notes of her husband to the amount of approximately $4,600, which notes had been renewed from time to time, and none of which were overdue on November 25, 1916." Minnie T. Connor assigned this second mortgage to Daniel A. Lucey, February 8, 1918.

The plaintiff and her husband during the year 1917 had extreme difficulties in financing the construction of the garage. On October 17, 1917, the Beacon Investment Association made an entry to foreclose their mortgage. Possession was not retained under such entry and there was no attempt to collect rents and profits of the property. On February 8, 1918, the association advertised the property for foreclosure sale under its mortgage. No notice was given by the association to either Mr. or Mrs. Flynn indicating its intention to advertise the property for foreclosure sale prior to such advertising. The first information obtained by the plaintiff or her husband concerning the fact that it was advertised came from the accidental discovery by Mr. Flynn of the advertisement. He immediately called Lucey on the telephone and the latter at once drove to Brookline and saw Mr. Flynn on the garage premises. Lucey told Flynn that it would be advisable to have the Beacon Investment Association drop its foreclosure proceedings and that, instead, the Curtis and Pope Lumber Company would proceed to foreclose its second mortgage. Lucey there and then stated in substance to Flynn that the Curtis and Pope Lumber Company was not seeking any profit nor was it desirous of taking his garage away from him; but that it wished primarily to protect itself and, in the second place, to protect Mr. and Mrs. Flynn so far as possible, and gave Flynn to understand that if it acquired the property it would be glad to sell it back to him or his wife at cost to it plus their indebtedness.

The master found that Flynn had reason to believe that if the Beacon Investment Association foreclosed its mortgage, it or its officers would acquire the property for the amount

of its mortgage, and he and his wife would have no opportunity to reacquire the same; while if Curtis and Pope Lumber Company should foreclose its second mortgage, Flynn felt that owing to his years of friendly relations with that company he would have an opportunity to reacquire the property and was, therefore, anxious to have Lucey arrange to stop the foreclosure of the Beacon Investment Association and begin a foreclosure in behalf of the Curtis and Pope Lumber Company.   The master in this regard further finds that the officers of the lumber company did not expressly state to the Flynns that they were holding the property in question, after the foreclosure sale, for the benefit of the plaintiff, but they knew that the plaintiff and her husband understood and believed that such was the situation; that they were holding the property first to secure themselves and then for the benefit of the plaintiff, and did not make any attempt to repudiate or contradict such understanding and belief on the part of the plaintiff and her husband. Thereupon Lucey arranged with the Beacon Investment Association to pay the accrued interest up to February 15, 1918, and to pay its attorney's fees in connection with the foreclosure and have such proceedings dropped.   Lucey thereupon with the assent of the Flynns advertised the property for foreclosure and sold it at the time and place and in the manner hereinbefore set forth.

Beginning with March, 1919, the plaintiff and her husband tried to get a statement of what they would have to pay to get back the garage property.   At their first interview they were unable to get any account and were told to wait the return of Pope, who had been ill and away for some time. At an interview in June Pope told them he had been ill and out of touch with the situation and referred them to Lucey. On September 15, 1919, the plaintiff wrote to the defendant as follows: " Will you kindly let me know how much I am indebted to you now for the Garage on St. Paul Street.   I have a friend who is willing to make a loan but I cannot tell him how much I shall need till I hear from you."   On the same day in reply Lucey wrote the plaintiff the following letter: " We have your letter of September 15th and would

say that the property on St. Paul Street stands us at the present time on our books, approximately eighteen thousand dollars above the first mortgage. Of course, this will vary from month to month, as we are making all charges of expense to this property and all credits for the receipts which we receive as income from the property. . . . [We hope] that you will be able to do something with this property." After the foreclosure sale the defendants through their agent Moffette called upon the plaintiff and asked permission to run a drain from the garage through her property to the sewer. In reference thereto the master found that Moffette did apply to the plaintiff for permission to cross other land owned by her in connection with the building of a drain; and that the plaintiff was induced to grant permission to enter the drain on her other land by the understanding and belief on her part that Curtis and Pope Lumber Company were holding the garage premises, first to secure themselves and then for the benefit of the plaintiff; and that Moffette and the officers of the defendant corporation knew the plaintiff so understood at the time and did not inform her that her rights and interest in the garage were entirely at an end.

Upon the foregoing facts and the inferences to be drawn therefrom the question for determination is, was the foreclosure intended to be a mere " friendly foreclosure," having for its purpose, as against the foreclosure of the first mortgage, a more efficient control of the title in the interest of the defendants and the Flynns, the debt of the Flynns to the defendants remaining undischarged and secured by the title to the equity of redemption acquired by the defendants through a formal foreclosure; or did the parties agree that the property should be bid in at the foreclosure sale for the defendants and that the defendants would sell it back to the plaintiff at cost to the defendants plus the indebtedness of the plaintiff and her husband to the defendants. It is plain the plaintiff consented to the foreclosure sale as it was conducted in the belief that the defendants would take title and would hold such title without a formal mortgage as security for the protection of themselves and of the plaintiff; and it is equally plain that the defendants knew that the

plaintiff consented that the title should be taken in the name of the defendants because she believed the defendants would hold the title not adversely but subject to a right of redemption in the plaintiff. We think the acts of the parties should be construed as evidencing an intention to put the legal title in the name of the defendants, and that the result should be held equivalent to a present loan of money from the defendants to the plaintiff upon the security of an absolute deed. We think this case is governed by *O'Brien* v. *Hovey,* 239 Mass. 37, and not by *Downing* v. *Brennan,* 232 Mass. 535.

The facts found by the master positively establish that Rittenberg had neither actual nor constructive knowledge of any facts or circumstances, prior to the delivery of his deed, of any claim of the plaintiff to any title in the premises. They show that Rittenberg was an innocent purchaser for value, and are in all material respects uncontradicted. It follows that the interlocutory decree must be affirmed.

*Decree accordingly.*