COMMIE WILLIAMS & another[1] *vs.* RESOLUTION GGF OY.

Suffolk. December 9, 1993. - March 25, 1994.

Present: LIACOS, C.J., WILKINS, NOLAN, LYNCH, & GREANEY, JJ.

*Consumer Protection Act*, Mortgage of real estate. *Mortgage*, Foreclosure. *Real Property*, Mortgage.

In an action alleging a mortgage holder's violation of G. L. 93A, §§ 2 (*a*) and 9, in the foreclosure of the mortgage on residential property, no liability of the defendant was shown, where the defendant had paid a reasonable price for the property at the foreclosure sale, i.e., the amount owed on the mortgage, and where the only other offer on the property before the foreclosure sale was substantially less than the amount owed on the mortgage or what the property was worth. [382-384] LIACOS, C.J., concurring.

Owners of mortgaged property who failed to seek to exercise their right of redemption prior to the foreclosure sale of the property were not harmed by the mortgage holder's failure to provide an accurate accounting of the amount due on the mortgage. [384]

Misstatement of the amount due on a mortgage note appearing on the notice of foreclosure was not demonstrated to be wilful or knowing on the part of the mortgage holder within the meaning of G. L. c. 93A, nor did the property owners demonstrate that they had relied on or were misled by the misstatement. [384-385]

CIVIL ACTION commenced in the Superior Court Department on July 13, 1988.

The case was heard by *John C. Cratsley*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Thomas J. Walsh* (*Robert M. Mendillo* with him) for the defendant.

*Andrew M. Fischer* for the plaintiffs.

---

[1] His brother, Ommie Williams.

GREANEY, J. We granted an application for further appellate review to decide whether the defendant was liable for failing to act in good faith and with reasonable diligence, thereby violating G. L. c. 93A, §§ 2 (*a*) and 9 (1992 ed.), in the foreclosure of a second mortgage on residential property owned by the plaintiffs, Commie and Ommie Williams.[2] A judge of the Superior Court, after conducting a trial without a jury, concluded that the defendant had violated G. L. c. 93A (1992 ed.). The Appeals Court, in an unpublished memorandum of decision entered pursuant to its rule 1:28, 34 Mass. App. Ct. 1123 (1993), characterized the matter as presenting "a close case," but affirmed the Superior Court judgment (with a modification of the damages award), and the denial of the defendant's motion for relief from the judgment. We conclude that a violation of G. L. c. 93A has not been shown. Accordingly, we reverse the judgment and order the entry of a new judgment for the defendant.

The trial judge found the following facts.

(a) In 1986, the plaintiffs, twin brothers, owned residential property at 22 Bradlee Street, a predominantly minority community located in the Dorchester section of Boston. They lived there with their extended family, including their sister, Della Milsap Huggins (Huggins), who was in charge of the

---

[2]The mortgage was given by the plaintiffs to Union Mortgage Company, Inc., which was the original defendant through the trial in the Superior Court and the decision by the Appeals Court. Subsequent to the argument of the appeal in this court, Resolution GGF Oy filed a motion to be substituted as the defendant in the case. The motion and supporting papers indicated that Resolution GGF Oy is a company wholly owned by the Government Guarantee Fund of Finland, that Union Mortgage Company, Inc., was a subsidiary of a Finnish bank, that that bank has serious economic problems, that the Bank of Finland took control of the bank which owned Union, and that Resolution GGF Oy has succeeded to the assets and liabilities of Union as of December 17, 1993, on behalf of the Government Guarantee Fund of Finland. Union's corporate existence has ceased, and Resolution GGF Oy, as Union's legal successor, has become the real party in interest in the case. The plaintiffs do not oppose the motion by Resolution GGF Oy to substitute. Accordingly, the motion is allowed with the notation that references throughout the opinion to the defendant are references to Union Mortgage Company, Inc., and to activities by its agents and employees.

family finances. Growth Mortgage Co., Inc. (Growth), held a first mortgage on the property to secure an underlying debt in a principal amount of $55,000, plus charges. At that time the plaintiffs owed $69,000 on their mortgage.

(b) In October, 1986, the plaintiffs signed an installment sales contract with a siding company for the installation of vinyl siding on their home. They also gave the siding company a second mortgage to secure payment of $42,810, which consisted of $19,800 in principal and $23,010 in interest and finance charges. Both the contract and the mortgage were assigned by the siding company to the defendant. The plaintiffs, although chronically late, made monthly payments to the defendant through June, 1987.

(c) In August, 1987, a fire gutted the property, which was not insured against fire. All of the plaintiffs' financial records, along with most of their other possessions, were destroyed. The family was scattered. Because of the expense involved in relocating, the plaintiffs were unable to make payments on either the first or second mortgage.

(d) Once settled, Huggins called a loan service manager for the defendant to inform him of the family's new addresses and to discuss their financial situation. The manager told her that the defendant intended to foreclose because its mortgage was in default, and that notification of the sale would be published. Although the defendant complied with the publication requirements of G. L. c. 244, § 14 (1992 ed.), it did not provide written notice to the plaintiffs as required by that statute.

(e) Prior to the foreclosure, the defendant's attorney also sent a notice of intent to foreclose pursuant to G. L. c. 140, § 90B (1992 ed.). That notice, however, was sent to 22 Bradlee Street, not to the new addresses provided to the defendant by Huggins. Furthermore, the notice misstated the principal due and owing to the defendant as $41,031.25, more than double the amount actually financed. Through their attorney, the plaintiffs asked the defendant repeatedly for an accounting, but the above misstatement of the debt was the only figure provided.

(f) Both Huggins and the plaintiffs' attorney informed the defendant before the foreclosure sale that they had potential buyers for the property, Winston and Joyce Sutherland. In an assessment done for the defendant's attorney following the fire, the property was found to have value only in the land. That value was placed at about $20,000.[3] Although the gutted house was deemed worthless, the Sutherlands were in a unique position to find value in it. They already lived in the neighborhood, and Winston Sutherland was a skilled carpenter.

(g) The defendant conceded that its staff and attorneys were negotiating a deal with the Sutherlands concerning the discharge of the plaintiffs' obligations to the defendant. Growth had also indicated its willingness to negotiate with the Sutherlands, as shown by the suspension of its foreclosure proceedings. The plaintiffs, through their attorney, asked a paralegal[4] in the law office representing the defendant whether the defendant would accept $12,000 to discharge its claim. After talking to the defendant's loan manager, the paralegal rejected the offer. The paralegal then refused to deal any further with the plaintiffs' attorney, stating that the attorney had a conflict of interest in representing both the plaintiffs and the Sutherlands. The defendant's loan manager also was aware that there was acrimony between the paralegal and the plaintiffs' attorney prior to the sale. Huggins indicated that she asked (through the plaintiffs' attorney) that the foreclosure sale be delayed so that the deal with the Sutherlands could be accomplished. The defendant refused. On July 14, 1988, the defendant was the only bidder at the foreclosure sale and purchased the property for the amount owed on the second mortgage.

---

[3]The transmittal letter for the appraisal, which was admitted in evidence at the trial, placed the value at "$15,000 to $20,000."

[4]The judge found that the paralegal, throughout his dealings with the attorneys for the plaintiffs and for the Sutherlands, encouraged the belief that he was an attorney with the authority to negotiate a deal for the defendant. The defendant does not argue that that finding is clearly erroneous, and we do not find it so.

(h) Following the foreclosure sale, attempts to negotiate with the Sutherlands continued. There was confusion among the parties as to the identity of the seller.[5] The defendant did agree, however, to accept $21,000 for its interest. Growth had agreed to take $25,000 plus attorneys' fees to discharge its interest. The Sutherlands would pay a total of $55,000, leaving the plaintiffs, after paying outstanding tax and water bills, with a small profit. The Sutherlands sent, through a new attorney, a $500 good faith deposit requested by the defendant. A series of closing dates were scheduled, and then postponed, by the paralegal acting for the defendant. Ultimately, Growth foreclosed, and the Sutherlands bought the property at auction for $11,000.

Based on these findings of fact, the judge ultimately concluded that the defendant had failed to demonstrate the good faith and reasonable diligence required of a foreclosing mortgagee. He reached this decision on the basis of four general conclusions, stating that the defendant had: (1) failed to bid adequately on the property at its own foreclosure; (2) failed to negotiate with the Sutherlands in a timely fashion; (3) failed to provide the plaintiffs with an accurate accounting of debt; and (4) misstated the amount due on its mortgage note, in its notice of intent to foreclose, in an attempt to accelerate future interest. The judge then concluded that these deficiencies constituted, collectively, a violation of G. L. c. 93A, §§ 2 (a) and 9, under the standards set forth in *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).

"In reviewing this case, we accept the judge's findings of fact as true unless they are clearly erroneous. Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 465 (1991). *Secretary of Envtl. Affairs* v. *Massachusetts Port Auth.*, 366 Mass. 755, 774 (1975) (in nonjury cases findings of fact are not set aside

---

[5]The confusion derived from the defendant's failure to obtain final approval of the sale from the Land Court and consequent questions as to the validity of the sale.

unless clearly erroneous). 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 792 (1986), quoting *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). On the other hand, to ensure that the ultimate findings and conclusions are consistent with the law, we scrutinize without deference the legal standard which the judge applied to the facts. *Marlow* v. *New Bedford*, 369 Mass. 501, 508 (1976). *Secretary of Envtl. Affairs* v. *Massachusetts Port Auth.*, *supra* at 773. Thus, the 'clearly erroneous' standard of appellate review does not protect findings of fact or conclusions based on incorrect legal standards. See *Marlow*, *supra*." *Kendall* v. *Selvaggio*, 413 Mass. 619, 620-621 (1992). The judge's four general conclusions set forth above constitute legal conclusions rather than factual findings, and we review them without deference.[6]

1. The judge's first two conclusions — that the defendant had acted in bad faith because it did not bid adequately on the property and failed to negotiate with the Sutherlands — were based on the factual findings that the defendant was aware of the Sutherlands' interest in the property, and that the Sutherlands "might be willing, with more negotiation, to pay more than what [the defendant] bid at the sale." See factual findings (f) and (g), *supra*. The evidence, however, does not support findings or conclusions that the defendant acted improperly in either rejecting the Sutherlands' initial offer or in declining to postpone the sale to negotiate further with them.

The law governing a mortgagee's responsibility to the mortgagor in the exercise of a power of sale is relatively straightforward. The mortgagee "must act in good faith and must use reasonable diligence to protect the interests of the

---

[6]The third and fourth of the judge's conclusions (lack of an accounting and misstatement of amount of the debt) have factual as well as legal elements. We do not differ with his factual findings regarding these issues, but review only the legal conclusions for their adequacy.

mortgagor." *Seppala & Aho Constr. Co.* v. *Petersen,* 373
Mass. 316, 320 (1977), quoting *West Roxbury Co-op. Bank*
v. *Bowser,* 324 Mass. 489, 492 (1949); *Cambridge Sav.
Bank* v. *Cronin,* 289 Mass. 379, 382 (1935). The mortga-
gee's duty is more exacting when it becomes the buyer of the
property. "When a party who is intrusted with a power to
sell attempts also to become the purchaser, he will be held to
the strictest good faith and the utmost diligence for the pro-
tection of the rights of his principal." *Union Market Nat'l
Bank* v. *Derderian,* 318 Mass. 578, 582 (1945), quoting
*Montague* v. *Dawes,* 14 Allen 369, 373 (1867). Consistent
with these requirements, the mortgagee has a duty "to obtain
for the property as large a price as possible." *Clark* v. *Sim-
mons,* 150 Mass. 357, 359 (1890). See also *Union Market
Nat'l Bank* v. *Derderian, supra* at 583.

The evidence indicated that the Sutherlands' interest in
the property was first brought to the defendant's attention
only a day or two before the foreclosure sale. At that time,
the plaintiffs' attorney made contact with the defendant's at-
torney to ask "whether [the defendant] would accept
$12,000 to discharge [its] claim." See factual finding (g),
*supra.* That sum was substantially less than what the defend-
ant was owed on its debt (approximately $20,000), or what
the property was then worth. See factual finding (f), *supra.*
There was nothing to indicate before the sale that the
Sutherlands would bid more than $12,000 at the foreclosure
sale or that they would offer more if the sale was postponed.
Moreover, although the plaintiffs describe negotiations with
Growth, the first mortgagee, there was no evidence that such
negotiations were underway at the time of the Sutherlands'
offer, or that, if they were, the defendant was informed of
those negotiations.

The judge indicated that the defendant purchased the
property "for the amount owed on [its] second mortgage,"
and stated that, "[o]n its face, the price paid by [the defend-
ant] seems reasonable." The judge also indicated that the de-
fendant's bid "discharged the [plaintiffs'] debt to them of ap-

proximately $20,000 in exchange for the [plaintiffs'] interest in the property, subject to Growth's prior interest." The execution of the memorandum of sale terminated the plaintiffs' equity of redemption. See *White* v. *Macarelli*, 267 Mass. 596, 598-599 (1929); *Outpost Cafe, Inc.* v. *Fairhaven Sav. Bank*, 3 Mass. App. Ct. 1, 7-8 (1975). The post-foreclosure events, therefore, lacked legal significance because the defendant was not obligated to sell its interest in the property, and the judge made no finding that a binding contract of sale was ever made. See factual finding (h), *supra.* These events also would not have informed the defendant *prior to* the sale that the Sutherlands might increase their offer. No liability under G. L. c. 93A has been shown from the events described above.

2. The defendant's failure to provide an accurate accounting, and its misstatement of the amount due on the mortgage note, also do not provide a basis for liability under G. L. c. 93A.

The plaintiffs had a right to an accounting incidental to their right of redemption. See *Mitchell* v. *Wright*, 234 Mass. 458, 466 (1920). The plaintiffs were aware of the principal amount of their note. There was no evidence that the plaintiffs sought to exercise their right of redemption prior to the foreclosure sale. As has been indicated, the execution of the memorandum of sale terminated their equity of redemption. The lack of an accounting caused the plaintiffs no harm. See *Massachusetts Farm Bureau Fed'n, Inc.* v. *Blue Cross of Mass., Inc.*, 403 Mass. 722, 730 (1989), and cases cited.

The misstatement of the amount due on the mortgage note was not found by the judge to have been wilful or knowing on the defendant's part.[7] The plaintiffs make no claim that

---

[7]Although the judge characterized the defendant's notice stating that the amount due on its loan was $41,031.25, as "an attempt to accelerate the future interest on the loan," that view is inconsistent with his conclusion that none of the defendant's actions were wilful or knowing violations. We believe that the most logical interpretation of this inconsistency is that the judge understood the misstated amount to have been calculated from the total of principal and interest over the course of the loan, but did not

they relied on or were misled by the notice.[8] The plaintiffs do not even maintain that they received the notice. The notice was sent to the address of the mortgaged property which had been rendered uninhabitable by the fire. The defendant made no effort to pursue the amount claimed, and, as has been previously discussed, the plaintiffs had not expressed any intention to redeem. The error in the notice also is insubstantial. See *Mechanics Nat'l Bank* v. *Killeen*, 377 Mass. 100, 109 (1979); *Massachusetts Farm Bureau Fed'n, Inc.* v. *Blue Cross of Mass., Inc., supra.* See also *Swanson* v. *Bankers Life Co.*, 389 Mass. 345, 349 (1983).

3. The defendant's conduct in the foreclosure of the mortgage was shabby and doubtless would not be followed by conscientious mortgagees. However, for the reasons discussed, the plaintiffs did not prove that liability should be imposed under G. L. c. 93A. The judgment is reversed, and a new judgment is to enter for the substituted defendant, Resolution GGF Oy.

*So ordered.*


LIACOS, C. J. (concurring). I reluctantly agree with the court that the trial judge's ruling that the defendant committed a G. L. c. 93A violation was clearly erroneous. I write separately to point out that this opinion should not be read as condoning the course of conduct carried out by the defendant throughout this transaction, and to express my dissatisfaction with the result of this case, which, I concede, is compelled on the record before us.

---

believe that it reflected an effort by the defendant impermissibly to collect that amount. We adopt that interpretation.

[8]The Appeals Court's memorandum of decision also indicates that the notice may not even have been required under G. L. c. 140, § 90B (1992 ed.), because the property may have had an assessed value greater than $40,000. That statute requires no notice of intent to foreclose for property having an assessed value greater than that amount.

The plaintiffs' complaint focused on the events surrounding the foreclosure on the property by the defendant, and, thus, those are the only events on which this court is passing in deciding whether there was a violation of G. L. c. 93A. I express serious doubt, however, whether other conduct by the defendant, not alleged in the plaintiffs' complaint, would have passed scrutiny under c. 93A.

The record reveals that the "principal" amount of the loan by Union was $19,800, but the defendant retained an 18% "discount" amounting to $3,564, plus a $75 "acquisition fee," so that only $16,161 of the $19,800 actually went toward the work done on the plaintiffs' home. This financing scheme hardly can be characterized as anything but usurious. See G. L. c. 271, § 49.

This same document in the record, dated October 8, 1986, also reveals that the defendant's approval of the loan was subject to the following condition, among others: "First [mortgage] to be current and not to exceed $36K [$36,000]." The record further reveals that the first mortgage, dated June 19, 1986, less than four months before the second mortgage, was in the principal amount of $55,000. There is no suggestion in the record that the above condition was satisfied, namely, that the plaintiffs should have paid off about $19,000 of the first loan before the loan by the defendant was made. In fact, the plaintiffs' sister, who maintained the family finances and paid the bills, testified that over $55,000 was owed on the first mortgage at the time of the fire, in August, 1987. Thus, the defendant made this loan even though its condition had not been met. This suggests that the defendant made a loan which, by the defendant's own recognition, the plaintiffs were unlikely to have the ability to repay unless the first mortgage was greatly reduced.

The record therefore reveals that a seemingly usurious loan, which never should have been made, resulted in the plaintiffs' losing their interest in their homestead. I find it difficult to imagine a transaction which more appropriately could be characterized as an unfair and deceptive trade practice. Unfortunately, the plaintiffs did not put the entire trans-

action before the court below, and so this court is compelled to find in favor of the defendant. Accordingly, I must concur, although I do so reluctantly.